## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MICHIGAN

---

**In the matter of:**

**Aaron Richards,**

     **Plaintiff,**

**v.**

**Sturgis Public Schools, Sturgis Public Schools Board of Education, St. Joseph Intermediate School District, St. Joseph Intermediate School District Board of Education, the Michigan Department of Education, the Michigan State Board of Education, and Brian Whiston, in his official capacity as State Superintendent,**

     **Defendants.**

**Case No.:**

**Hon:**

**JURY TRIAL DEMANDED**

---

Mark Cody (P42695)
Michigan Protection and Advocacy Service, Inc.
Attorney for Plaintiff
4095 Legacy Parkway, Suite 500
Lansing, MI 48911-4263
(517) 487-1755
mcody@mpas.org

Caroline Jackson *(Admission pro hac vice pending)*
Anna Bitencourt *(Admission pro hac vice pending)*
Attorney for Plaintiff
National Association of the Deaf Law and Advocacy Center
8630 Fenton Street, Suite 820
Silver Spring, MD 20910
(301) 587-7466
caroline.jackson@nad.org

---

## **COMPLAINT**

## I. INTRODUCTION

1.      Plaintiff, Aaron Richards ("Aaron"), by and through his undersigned counsel, hereby submits the following Complaint against Sturgis Public School ("Sturgis" or "the District"), Sturgis Public Schools Board of Education ("Sturgis Board"), St. Joseph Intermediate School District ("the ISD"), St. Joseph Intermediate School District Board of Education ("the ISD Board"), the Michigan Department of Education ("MDE"), the Michigan State Board of Education ("the State Board"), and Brian Whiston, in his official capacity as State Superintendent (collectively "Defendants"), pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400 *et seq.*; the Michigan Administrative Rules for Special Education ("MARSE"), Michigan Admin. Code R. 340.1701 *et seq.*; the Michigan Persons with Disabilities Civil Rights Act ("PDCRA"), M.C.L. 37.1101 *et seq.*; Section 504 of the United States Rehabilitation Act of 1973 ("Section 504"), 29 U.S.C. § 794; and Title II of the Americans with Disabilities Act ("Title II"), 42 U.S.C. §§ 12131 *et seq*.

2.      Plaintiff contends that throughout Aaron's educational career, Defendants have failed to provide him with a free and appropriate public education ("FAPE"), as required by the IDEA and the MARSE, have failed to provide him with an equal educational opportunity, and have discriminated against him on the basis of his disability, in violation of Section 504 and the ADA.

## II. JURISDICTION AND VENUE

3.       This Court has jurisdiction over this claim pursuant to 28 U.S.C. §§ 1331, 1343, and 1367.

4.      Administrative exhaustion of claims against the MDE, the State Board, and Brian Whiston is not necessary due to futility. The jurisdiction of the administrative tribunal is limited to "the identification, evaluation, or educational placement of the child, or the provision of a free

appropriate public education to such child," 20 U.S.C. § 1415(b)(6), and does not have jurisdiction over the systemic violations alleged below.

5.     Plaintiff has exhausted his administrative remedies for all claims against the ISD and the ISD Board through the due process complaint filed on January 3, 2018. In an Order dated March 6, 2018, Administrative Law Judge Robbins dismissed all claims against the ISD and ISD Board.

6.     Plaintiff has exhausted his administrative remedies against the District and the Sturgis Board for claims brought under Section 504 of the Rehabilitation Act, Title II of the ADA, and the Michigan Persons with Disabilities Civil Rights Act. ALJ Robbins dismissed these claims in an order dated March 6, 2018.

7.     Plaintiff is currently exhausting administrative remedies for all remaining claims against the District and the Sturgis Board alleged below.

8.     Venue is proper in the Western District of Michigan pursuant to 28 U.S.C. § 1391 because: (i) Defendant operates a place of business within the District and has sufficient contacts with this District to subject it to personal jurisdiction at the time this action is commenced; and (ii) the acts and omissions giving rise to this claim have occurred within the District.

### III. PARTIES

9.     Aaron is an 18-year-old student with a disability who resides in the Sturgis Public Schools District. Aaron turned 18 on March 30, 2017.

10.     Aaron currently attends the Michigan School for the Deaf ("MSD") in Flint, Michigan. Previously, from preschool through the 2015-2016 school year, Aaron attended school in the District. For a majority of that time, Aaron resided in the District with his mother, Colleen Hagadorn. Aaron is a student with a disability, as defined by the IDEA and MARSE under the category of Hearing Impairment. He is also an individual with a disability within the meaning of

Section 504, the ADA, and the PDCRA, as he has a physical impairment that substantially limits one or more major life activity, including hearing and speaking.

11.    Sturgis Public Schools is Aaron's home district and as such, is the local education agency ("LEA") responsible for providing him with a FAPE and the procedural protections required under the IDEA. Sturgis is a recipient of federal financial assistance, subject to the requirements of Section 504, 34 C.F.R. § 104.11, and a public governmental entity subject to the provisions of the ADA, 42 U.S.C. §§ 12132, 12131(1)(A), (B).

12.    Sturgis Public Schools Board of Education ("Sturgis Board") is the Board of Education for Sturgis Public Schools. The Sturgis Board "exists for the purpose of providing a system of free, public education for students in grades Pre-K - 12 inclusive."[1] The Sturgis Board has the authority to supervise Sturgis.[2] Its powers include educating students and hiring, contracting for, scheduling, supervising, or terminating employees, independent contractors, and others who work at Sturgis.[3] These powers also include making many different kinds of decisions regarding the evaluation, compensation, discipline, and discharge of individual Sturgis personnel.[4] The Sturgis Board is responsible for ensuring Sturgis complies with state and federal laws, including special education and disability rights laws, and to establish district-wide policies.[5]

13.    St. Joseph Intermediate School District ("the ISD") is the regional educational service agency, as defined in M.C.L. 380.4(3), of which Sturgis is a constituent school district. The ISD provides special education services and supports to its constituent LEAs, including

---

[1] Sturgis Public Schools Bylaws and Policies, Section 0112 "Purpose," available at http://www.neola.com/sturgis-mi/.
[2] *Id.*, Section 0121 "Authority."
[3] *Id.*, Section 0122 "Board Powers."
[4] *Id.*
[5] *Id.*, Section 0123 "Philosophy of the Board."

4

speech and language therapy and services for deaf and hard of hearing students.[6] Additionally, the ISD receives federal funding to provide special education services. MARSE R. 340.1801. St. Joseph ISD representatives have participated in Aaron's Individualized Education Program ("IEP") meetings.

14.     The ISD Board of Education ("ISD Board") is the legal entity for providing specialized educational services within the ISD.[7] The ISD Board "exists to serve as a liaison agency between the local school districts in St. Joseph and portions of contiguous counties or the State Department of Education and to provide those educational programs and services requested by the constituent districts or mandated by the State."[8] The ISD Board supervises the ISD.[9] Its powers include educating students and hiring, contracting for, scheduling, supervising, or terminating employees, independent contractors, and others who work at the ISD.[10] These powers also include making many different kinds of decisions regarding the evaluation, compensation, discipline, and discharge of individual ISD personnel.[11] The ISD Board is responsible for ensuring the ISD complies with state and federal laws, including special education and disability rights laws, and establishes appropriate policies that apply to all constituent school districts in its region.[12]

15.     The Michigan Department of Education ("MDE") is the department of the State of Michigan government responsible for administering and enforcing laws related to public education. M.C.L. 16.400-16.402. As the state education agency, ("SEA"), MDE has the ultimate supervisory responsibility for ensuring that LEAs, like Sturgis, provide students with

---

[6] http://sjcisd.org/departments/special-education/.
[7] https://sjcisd.org/district/board-of-education/.
[8] St. Joseph ISD Bylaws and Policies, Section 0112 "Purpose," available at http://www.neola.com/stjosephisd-mi/.
[9] *Id.*, Section 0121 "Authority."
[10] *Id.*, Section 0122 "Board Powers."
[11] *Id.*
[12] *Id.*, Section 0123 "Philosophy of the Board."

disabilities with a FAPE and the procedural safeguards guaranteed by the IDEA. 20 U.S.C. § 1412(a)(11(A). MDE is also a recipient of federal financial assistance subject to the requirements of Section 504, 34 C.F.R. § 104.11, and a public governmental entity subject to the provisions of the ADA, 42 U.S.C. §§ 12132, 12131(1)(A), (B).

16.     MDE runs the Office of Special Education ("OSE").[13] OSE "provides the general supervision, administration, and funding of special education programs and services for eligible children and youth with disabilities from birth through age 25, in accordance with federal and state law."[14]

17.     OSE objectives include "Identification of eligible children and youth with disabilities and the provision of appropriate intervention and educational services per state and federal statutes"; "Develop, disseminate, and implement state-wide special education policy"; "Administer the state's system for Intermediate School District plans for the delivery of special education programs and services"; "Collaborate with all Michigan Department of Education offices and Michigan's state agencies regarding special education policy"; "Coordinate the Continuous Improvement and Monitoring System (CIMS), focused monitoring activities (state-verified desk audits, state-verified self reviews, and on-site visits) and approval of local education agency and intermediate school district corrective action plans in response to findings of noncompliance"; and "Provide and coordinate technical assistance to districts and stakeholder organizations."[15]

18.     MDE also conducts Low-Incidence Outreach (MDE-LIO), which is funded through OSE. MDE-LIO "provides technical assistance and resources statewide to serve and improve the quality of education for . . . students who are Deaf or Hard of Hearing (DHH),

---

[13] http://www.michigan.gov/mde/0,4615,7-140-6530---,00.html.
[14] http://www.michigan.gov/documents/mde/OSE_DirectoryOverview_511569_7.pdf.
[15] http://www.michigan.gov/mde/0,4615,7-140-6530_6598-113565--,00.html.

including those with multiple impairments." MDC-LIO services include "Consultation; Classes/workshops/conferences; Professional development; . . . Sign Language Assessments (ASLPI & MSLPI)."[16]

19.     The Michigan State Board of Education ("the "State Board") is responsible for leadership and general supervision of all public education, including adult education and instructional programs of the state institutions. M.C.L. 388.1009. "[T]he State Board has many direct supervisory duties in connection with local school districts."[17]

20.     The State Board has jurisdiction and control of the Michigan School for the Deaf which is located in Flint, Michigan. M.C.L. 388.1010. The Michigan School for the Deaf shall be considered a part of the total continuum of services for students who are deaf or hard of hearing. R. 340.1721e(5).

21.     The State Board has a special education advisory committee, which "act[s] as an adviser to the state board of education in the field of special education." M.C.L. 388.1009a. The special education advisory committee is required by the Individuals with Disabilities Education Act, 20 U.S.C. §§ 1400, *et seq.*[18]

22.     The mission of the State Board's special education advisory committee "is to support opportunities for all students in Michigan and especially those with disabilities by gathering, sharing, and disseminating information with the public; advising the State Board of Education; and working with the Office of Special Education."[19]

23.     The special education advisory committee's duties include: "Advise the State Educational Agency of unmet needs within the state in the education of children with

---

[16] *Id.*
[17] http://www.michigan.gov/mde/0,4615,7-140-5373-10506--,00.html.
[18] http://seac.cenmi.org/about/duties-role/.
[19] http://seac.cenmi.org/.

disabilities"; and "Advise the State Educational Agency in developing and implementing policies relating to the coordination of services for children with disabilities."[20]

24.     Defendant Brian Whiston is the State Superintendent for the Michigan Department of Education and the Chairman of the State Board of Education. He is being sued in his official capacity.

### IV. FACTS

25.     Aaron was diagnosed with severe to profound bilateral sensorineural hearing loss at 18 months of age. Aaron has average intellectual ability. Testing done throughout his life has not indicated any reason other than being deaf that might impede academic progress or linguistic development.

26.     From 2004 to 2016, the District engaged in an ongoing practice of failing to provide Aaron with an education appropriate to his needs as a student who is deaf or hard of hearing. Due solely to the District's failure to provide him with the necessary accommodations that would have enabled him to be educated, as of Aaron's junior year in high school, he was reading at a first-grade level, performing math at an elementary school level, and possessed the receptive and expressive language skills of a child between 9 and 11 years old.

27.     These failures were marked by an ongoing practice of failing to provide individuals who possessed the minimum qualifications for ensuring Aaron received a FAPE. For one, the District acted with gross misjudgment by routinely providing Aaron with a teaching assistant who knew some sign language rather than a sign language-fluent interpreter. Consequently, Aaron was routinely deprived of *any* access to an individual fluent in the language he was expected to acquire (Signed English), as well as being severely limited in his access to the academic classroom. Additionally, the District acted in bad faith by coercing Aaron's mother

---

[20] http://seac.cenmi.org/about/duties-role/.

to accept these substandard services, and by failing to evaluate Aaron's progress in the overall acquisition of language (both spoken and signed), preventing Aaron and his mother from learning the true extent of his educational deprivations.

28.     When Sturgis finally provided an appropriate educational program by placing Aaron at the Michigan School for the Deaf for the 2016-2017 school year, Aaron made drastic gains in just a single year. For example, he can now do math at a late high school level and he reads at a third-grade level.

29.     Central to the lack of an appropriate education was the District's 12-year failure to provide Aaron accommodations in the form of consistent or sufficiently trained sign language interpreter services, which resulted in a debilitating lack of exposure to accessible language models and classroom instruction, leading to skill deficits that will impact Aaron for the rest of his life. Due to these deficits in language modeling and instruction, Aaron never gained the sign language vocabulary to fully benefit from any interpreting services that the District did provide.

30.     On November 28, 2000, when Aaron was 18 months old, the ISD conducted a multidisciplinary evaluation of Aaron and found that he was deaf, which adversely affected his educational performance. The ISD evaluation team did not find any cognitive deficits.

31.     On November 26, 2003, the ISD conducted another multidisciplinary evaluation and found that Aaron continued to be a student who is deaf and therefore eligible for special education and related services under the IDEA. The ISD also found Aaron eligible as a student with a speech and language impairment, secondary to being deaf or hard of hearing.

32.     As a young child, Aaron received a cochlear implant. While the implant allows Aaron some access to sound, it does not enable him to understand classroom instruction nor the input of his fellow students.

33.     In Aaron's June 1, 2005 Individualized Education Program ("IEP"), the District determined that he required sign language support to benefit from his academic environment. The District determined that support should be provided by using signs that corresponded with English words, a system known as "Signed English."[21]

34.     The District committed to providing Aaron with paraprofessional support throughout the school day. However, the aide assigned to Aaron was not a sign language interpreter and did not know sign language at all. Rather than being able to teach Aaron sign language, the aide learned sign language along with him.

35.     Because the aide was not fluent in sign language and was not a sign language interpreter, she could not model for Aaron the full range of vocabulary and grammar typical for students his age. Further, to convey to Aaron what the students and teachers were saying, the aide had to simplify classroom content to a level commensurate with her own limited signing skill. This process denied Aaron meaningful, equal access to classroom instruction; an opportunity for language learning equal to his peers; and the opportunity to make academic and linguistic progress appropriate in light of his circumstances.

36.     This unqualified aide served as Aaron's sole source of language modeling and communication throughout elementary school, and then resigned from the District.

37.     For the first six months of middle school, Aaron was assigned a new paraprofessional who was a proficient signer; however, the aide was not a qualified interpreter. After six months of working with Aaron, the aide left and the District failed to provide any sign language support for some time.

---

[21] Signed English is a signing system that adapts the vocabulary of American Sign Language to correspond exactly with English vocabulary, and to use English grammar and communication structure. By contrast, American Sign Language has a distinct vocabulary, grammar, and communication structure from English; children learning American Sign Language must learn English separately.

38.     On March 8, 2012, the District convened an IEP team meeting to develop a plan for Aaron that would be in place for the remainder of the 2011-2012 school year, and the subsequent school year. In the resulting IEP, the District committed to providing Aaron with an educational interpreter.

39.     At the start of the 2012-2013 school year, Aaron's 8th grade year, an educational interpreter was not provided by the District, despite the March 8, 2012 IEP calling for one. The District transferred a teaching assistant who knew some sign language to work with Aaron, however, this person was not a qualified interpreter.

40.     Without an interpreter, Aaron was not able to participate in classroom discussions or receive instruction from the teacher in real time. Further, to convey to Aaron what the students and teachers were saying, the aide had to simplify classroom content to a level commensurate with her own limited signing skill. This process denied Aaron meaningful, equal access to classroom instruction; an opportunity for language learning equal to his peers; and the opportunity to make academic and linguistic progress appropriate in light of his circumstances.

41.     On September 6, 2012, Aaron's mother, Colleen Hagadorn, filed an administrative complaint due to the absence of the sign language interpreter that the school had committed to provide since March of that year.

42.     At this time, Aaron's mother, Colleen Hagadorn, was aware the absence of an interpreter denied Aaron access to classroom content. However, she did not and could not have known that the absence of an interpreter interfered with Aaron's opportunity to learn language at all.

43.     The complaint was resolved during a resolution session, as Sturgis began providing an interpreter on October 1, 2012. This person was not a qualified interpreter, however, and only worked with Aaron for a short period of time.

44.     Thereafter, the District provided a series of assistants who were not trained in or capable of interpreting and simply gave Aaron short written summaries of classroom discussions and lectures after they took place. Aaron had to be pulled out of class for one-on-one instruction with these assistants, as they could not convey classroom instruction or discussions in real time.

45.     Consequently, Aaron did not have the opportunity to receive instruction at an eighth-grade pace and integrate it through discussion with classmates, as students are expected to do at that level. Instead, he received the limited, simplistic explanations his aides could convey through broken sign language, with no opportunity to discuss the material with peers. As in other similar instances, this process denied Aaron meaningful, equal access to classroom instruction; an opportunity for language learning equal to his peers; and the opportunity to make academic and linguistic progress appropriate in light of his circumstances.

46.     Evaluations of Aaron's academic performance reflect the severe deficits in the educational access that the District provided. A variety of academic tests administered in Aaron's eighth grade year showed he was reading at a second-grade level, and had tested "Not Proficient" in both science and math.

47.     One of the academic tests involved an interview. The interviewer described Aaron's "basic reading skills and reading comprehension skills" as "extremely low." For example, one task involved writing down a dictated paragraph. The paragraph was presented both in spoken English and using the so-called interpreter. The examiner noted "[i]t was unclear

how much of the written language deficit was difficulty understanding what was dictated in the first place or how much was due to having difficulty expressing himself."

48.     Despite the prolonged lack of access to classroom instruction and obvious academic deficits, the District did not consider or offer Extended School Year services to Aaron.

49.     In high school, Aaron continued to experience several changes in services. At times, Sturgis provided a paraprofessional signing "aide" who was not an interpreter, at times Sturgis provided an unqualified interpreter, and at times Sturgis provided nothing at all.

50.     Like his middle school experience, the stream of unqualified signers that the District provided did not ensure access to his learning environment. Instead of being able to learn and integrate information at a high school pace, according to a high school-level process, Aaron's access was again limited to the broken sign language of the unqualified personnel provided by the District, or written summaries of classroom instruction (which he could not read), if he received anything at all. As in other similar instances, this process denied Aaron meaningful, equal access to classroom instruction; an opportunity for language learning equal to his peers; and the opportunity to make academic and linguistic progress appropriate in light of his circumstances.

51.     For the 2015-2016 school year, Sturgis required Aaron to share an interpreter with another student with whom he had no overlapping classes. Due to the sharing arrangement, Aaron only had access to this interpreter for a few hours each day. To make matters worse, this so-called "interpreter" had learned Signed English from a book and had a below-basic command of the signing system.

52.     Throughout this entire time, Sturgis never disputed that Aaron required a sign language interpreter to access instruction. Therefore, the absence of a qualified sign language interpreter was due solely to Sturgis' failure to provide one.

53.     Further, despite prolonged periods of time where Sturgis failed to provide Aaron access to classroom instruction, the District did not consider or offer Extended School Year services.

54.     Sturgis made no attempt to assist Aaron's parents in learning sign language to ensure that Aaron's exposure to language continued after the school day ended and on weekends.

55.     Academic assessments conducted in early 2016, indicated that Aaron had very limited language competence and limited language-related academics. On the iReady assessment, which rates students from "Level K" to "Level 12," Aaron tested at Level 1 (the second-lowest rating) in both Basic Reading and Reading Comprehension.

56.     Importantly, this entire time the District purported to instruct Aaron either in spoken or signed English. While the high turnover in paraprofessionals and interpreters may have impacted academic performance, turnover alone would not cause a student to reach the end of high school with such limited language competence. Rather, Aaron's limited ability to communicate in *any* language— signed or spoken—is attributable solely to the District's failure to provide Aaron with appropriate language models or language instruction for approximately 12 years.

57.     Over this time period, Aaron's mother attempted to advocate for her son and obtain better services, but these efforts were unsuccessful. Often, Aaron's mother was persuaded to accept sub-standard services, such as an assistant who knew basic sign instead of a sign language interpreter, due to Sturgis' representation that better services were not available.

58.     Further, over this time period, the District withheld information that would have revealed the full extent of Aaron's educational deprivation. While the District repeatedly tested and reported Aaron's slow progress in academic areas, such as reading, writing, and mathematics, the District never tested Aaron's overall language competence—including both spoken and signed English. Aaron's mother did not know Signed English and could not be expected to notice his deficits in Sign English without an evaluation from the school. Therefore, Aaron and his mother did not and could not have known that throughout Aaron's education, he had been falling behind not only in academics but also in the building blocks of all learning: language acquisition.

59.     Of its own volition, Defendants never considered or suggested placement at the Michigan School for the Deaf (MSD) for Aaron.

60.     In August 2016, Aaron, through his advocate, requested that Sturgis invite MSD to his IEP team meeting.

61.     For the first time in 12 years, Sturgis invited MSD to Aaron's IEP meeting to assist with developing an appropriate program to meet his needs. The IEP team, for the first time, considered placement at MSD and decided that it was necessary to meet Aaron's needs.

62.     Sturgis failed to contact MSD prior to 2016, in part due to the Michigan Department of Education and the Michigan Board of Education's failures in developing, disseminating, and implementing policies and practices that ensure local and intermediate school district are aware of MSD and use MSD as a resource for serving deaf and hard of hearing students.

63.     Aaron began attending MSD in the Fall of 2016.

64.     Aaron lives on campus in the dormitories at MSD while school is in session.

65.     At MSD, Aaron is learning American Sign Language ("ASL") in addition to working on his reading and writing skills in English.

66.     At MSD, Aaron is immersed in ASL from the time he wakes up until he goes to bed. He receives instruction in ASL from teachers who have the training and experience to teach ASL, and to teach deaf students with Aaron's unique background. Aaron also has exposure to a variety of peers who use ASL.

67.     Since arriving at MSD, Aaron has made great strides academically. In math, he improved from a grade-level equivalent of 5.3 to a grade-level equivalent of 12.5. In reading, he has improved from reading at a first-grade level to reading at a third-grade level.

68.     These gains are particularly significant because Aaron has simultaneously been acquiring a new language, ASL.[22]

69.     Despite his progress since transferring to MSD, Aaron is likely to experience permanent academic, social, and linguistic deficits due to the inadequate education and inadequate educational access he received from Sturgis.

70.     In September 2016, Aaron was evaluated by Dr. Peter K. Isquith, Ph.D., a licensed psychologist with a clinical specialty in working with deaf and hard of hearing individuals. Dr. Isquith's testing conformed with prior academic testing, indicating that Aaron was an individual of average or better ability to learn and reason, with no cognitive deficits. There were no deficits observed with attention, self-regulation, learning, memory, or motor function.

71.     Dr. Isquith found that Aaron demonstrated ongoing deficits in language and language-related academic skills. His understanding of the structure of the English language had

---

[22] ASL is a distinct language from English and from Signed English. Although Signed English adapts its vocabulary from ASL, the two languages have a distinct grammar and discourse style. Therefore, Aaron indeed had to learn ASL simultaneously with other academic courses.

remained limited since early elementary school, despite the District's representation that it was exposing Aaron to both spoken and signed English. Dr. Isquith concluded that Aaron's limited language competence and lack of academic skills were the direct result of the limited and sporadic exposure to accessible language provided by the District. The majority of time Aaron spent in school, he was not provided with sufficient communication options, models, or opportunities to communicate with teachers or peers.

72.     Dr. Isquith did not attribute Aaron's limited language competence to a compounding disability, such as a speech and language impairment, but to Sturgis' failure to provide Aaron with appropriate language instruction and language exposure during the 12 years Aaron attended Sturgis' schools.

73.     Dr. Isquith characterized the District's treatment of Aaron as a form of severe neglect, called "linguistic deprivation," which he defined as a neurodevelopmental syndrome stemming from the choices made for children by their educational and medical professionals. He described such neglect as a "pattern of very limited early exposure to an accessible language and chronic absence of a linguistically accessible environment" for most of Aaron's life. Linguistic deprivation is not a disability any child is born with, but a syndrome caused by severe shortcomings on the part of those responsible for delivery of a child's education.

74.     Linguistic deprivation is associated with numerous long-term cognitive, academic, social and psychiatric risks, along with vocational, educational, and financial consequences.

75.     Dr. Isquith opined that Aaron would have been a good candidate for college if the District had provided him with necessary accessible language models throughout his educational career. Unfortunately, due to the District's neglect, this path presents a limited option. As Sturgis

did not provide Aaron with appropriate language exposure or instruction for well over a decade, he will never develop the language fluency or the literacy levels necessary to pursue higher education, except at a remedial or vocational level. And as Aaron has essentially missed the majority of his education, he is unlikely to attain an age-appropriate level of world knowledge, much less the academic skills necessary for higher education. Due to these deficits, he is expected to have significant difficulty competing in the workforce with other high school graduates, even using the auxiliary aids and services typically available to deaf and hard of hearing individuals.

76.     Along with the detrimental effects on access to higher education and many vocational options, Dr. Isquith also predicted substantial issues with Aaron's future relationships and interactions with others. The District's neglect of Aaron's needs resulted in highly limited access to peer interactions and a lack of development of the social skills inherent in those interactions.

77.     Going forward, in addition to academic and vocation support, Aaron will require social work support to teach him how to develop and maintain friendships. Aaron has not been able to develop such skills naturally due to the severe isolation he experienced at Sturgis.

78.     In sum: Aaron is an intelligent and cooperative person who, even as a deaf man, could have been expected to graduate high school, attend college, obtain gainful employment and lead a normal, productive life. Due to the District's 12-year failure to provide him with appropriate language instruction, language models, or communication access to his classroom, Aaron has no hope of even approaching this level of academic, vocational, or social success and likely will be limited to unskilled labor and immature social interactions. This injury has caused

and will continue to cause Aaron and his family to experience severe emotional distress as well as long-term economic hardship.

79.     On information and belief, the District acted according to a policy or widespread practice of failing to provide a FAPE to deaf and hard of hearing students.

80.     The Sturgis Board is responsible for setting policies for the District and therefore is responsible for any injuries that Aaron sustained.

81.     The Sturgis Board has sufficient powers regarding the hiring, firing, and supervision of Sturgis employees to be held liable for their acts.

82.     On information and belief, the ISD acted according to a policy or widespread practice of failing to provide a FAPE to deaf and hard of hearing students.

83.     The ISD Board is responsible for setting policies for the ISD and therefore is responsible for any injuries that Aaron sustained.

84.     The ISD Board has sufficient powers regarding the hiring, firing, and supervision of ISD employees to be held liable for their acts.

85.     State Defendants are also responsible for setting policies for local and intermediate school districts, and therefore are responsible for any injuries that Aaron sustained.

86.     Defendants' acts have deprived Aaron of the FAPE he is entitled to by law.

87.     Defendants' acts have deprived Aaron of his equal opportunity to receive the benefits that other participants in Defendants' programs and services enjoy.

88.     Defendants' acts were knowing and intentional.

89.     Defendants acted in bad faith and/or exercised gross misjudgment.

90.     As a result of Defendants' conduct, Aaron has experienced severe emotional distress, such as humiliation, frustration, anxiety, sadness, hopelessness, and other forms of mental and emotional anguish.

## VI. COUNTS

**A.     DEFENDANTS VIOLATED THE INDIVIDUALS WITH DISABILITIES EDUCATION ACT, 20 U.S.C. §§ 1400 *et seq.***

91.     Aaron was unable to bring these claims earlier due to minority. He reached the age of majority on March 30, 2017.

92.     Plaintiff incorporates by reference all previous paragraphs of the Complaint herein.

93.     Congress passed the Individuals with Disabilities Education Act ("IDEA") to ensure "that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living" and "to ensure that the rights of children with disabilities and parents of such children are protected." 20 U.S.C. § 1400(1)(A), (B).

94.     The IDEA requires states receiving IDEA funds to have "in effect policies and procedures to ensure that the State meets each of the following conditions": (1) "A free appropriate public education is available to all children with disabilities residing in the State between the ages of 3 and 21, inclusive, . . ."[23]; (2) "An individualized education program, or an individualized family service plan that meets the requirements of section 1436(d) of this title, is developed, reviewed, and revised for each child with a disability in accordance with section

---

[23] In Michigan, a FAPE must be provided to students with disabilities through age 26, pursuant to the MARSE. *See* R. 340.1702.

20

1414(d) of this title"; and (3) "Children with disabilities and their parents are afforded the procedural safeguards required by section 1415 of this title," among others. 20 U.S.C. § 1412.

95.     The IDEA requires local education agencies receiving IDEA funding to "submit[] a plan that provides assurances to the State educational agency that . . . . [t]he local educational agency, in providing for the education of children with disabilities within its jurisdiction, has in effect policies, procedures, and programs that are consistent with the State policies and procedures established under section 1412 of this title." 20 U.S.C. § 1413(a).

96.     The IDEA carries additional provisions outlining the substantive and procedural requirements of the Act, including the obligation to evaluate each child and to provide an IEP that ensures the student receives a FAPE in the least restrictive environment able to meet the child's needs, as well as various procedural protections. 20 U.S.C. §§ 1414, 1415.

97.     MDE and the State Board are each a State Education Agency within the meaning of the IDEA and are therefore subject to the statute's mandates and obligations. 20 U.S.C. § 1412.

98.     The District, Sturgis Board, the ISD, and the ISD Board are each a Local Education Agency within the meaning of 20 U.S.C. § 1413 and are thus subject to the IDEA.

99.     At all times relevant to this complaint, Aaron has been a child with a disability under 20 U.S.C. § 1401(3).

100.    Defendants violated Aaron's rights by intentionally failing to provide Aaron with a FAPE.

101.    Defendants continue to violate Aaron's rights under the IDEA by knowingly failing to provide social work support. Such services are necessary for Aaron to receive a FAPE.

102.   Defendants did not provide the intensive language instruction required in order for Aaron to develop effective communication skills.

103.   Defendants did not provide Aaron with consistent exposure to an accessible mode of language such as sign language.

104.   Defendants did not address Aaron's lack of progress towards the goals in his IEP.

105.   Defendants restricted Aaron's individualized education program to the programs and services available.

106.   Defendants never evaluated Aaron's proficiency in sign language, thereby withholding information regarding his progress in acquiring sign language.

107.   Defendants never evaluated Aaron's overall language proficiency (signed and spoken), thereby withholding information regarding his progress in acquiring language.

108.   Defendants did not address Aaron's functional needs, such as their need for socialization.

109.   Defendants failed to consider opportunities for direct instruction and direct interaction with peers.

110.   Defendants failed to consider the total continuum of services for students who are deaf or hard of hearing.

111.   Defendants did not provide Aaron with extended school year services nor did it keep data to determine whether extend school year services were necessary.

112.   Defendants otherwise violated Aaron R's right to receive a FAPE.

113.   The Defendants, through their actions and failure to accommodate Aaron, have denied Aaron meaningful, equal access to classroom instruction; an opportunity for language

learning equal to his peers; and the opportunity to make academic and linguistic progress appropriate in light of his circumstances.

## B.   DEFENDANTS VIOLATED THE MICHIGAN ADMINISTRATIVE RULES FOR SPECIAL EDUCATION

114.   Plaintiff incorporates by reference all previous paragraphs of the Complaint herein.

115.   The Michigan Administrative Rules for Special Education (MARSE), R. 340.1700 *et seq.* set the administrative rules for special education and related services in the state of Michigan.

116.   MARSE defines special education as "specially designed instruction, at no cost to the parents, to meet the unique educational needs of the student with a disability and to develop the student's maximum potential. Special education includes instructional services defined in R 340.1701b(a) and related services." R. 340.1701c(c).

117.   Pursuant to MARSE, "[t]he individualized education program team shall determine the programs and services for a student with a disability in accordance with 34 CFR part 300. The individualized education program shall not be restricted to the programs and services available." R. 340.1721e(4).

118.   Further, "[t]he Michigan school for the deaf shall be considered a part of the total continuum of services for students who are deaf or hard of hearing. The resident district shall conduct the individualized education program team meeting that initiates an assignment into the Michigan school for the deaf. Representatives of the intermediate school district of residence and the Michigan school for the deaf shall be invited to participate in the individualized education program team meeting. R. 340.1721e(5).

119.   Aaron is a student receiving special education services under MARSE.

23

120.    Defendants are covered entities subject to MARSE.

121.    Defendants failed to provide Aaron with instruction to develop their maximum potential, in violation of MARSE.

122.    Defendants restricted Aaron's individualized education program to the programs and services available, in violation of MARSE.

123.    Defendants failed to consider the Michigan School for the Deaf as part of the total continuum of services for Aaron, in violation of MARSE.

124.    Defendants engaged in additional violations of MARSE with respect to Aaron.

## C.    DEFENDANTS VIOLATED SECTION 504 OF THE REHABILITATION ACT, 29 U.S.C. § 794

125.    Plaintiff incorporates by reference all previous paragraphs of the Complaint herein.

126.    Pursuant to Section 504 of the Rehabilitation Act of 1973 ("Section 504") and its regulations, "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ." 29 U.S.C. § 794.

127.    The regulations regarding Preschool, Elementary, and Secondary Education apply to "preschool, elementary, secondary, and adult education programs or activities that receive Federal financial assistance and to recipients that operate, or that receive Federal financial assistance for the operation of, such programs or activities." 34 C.F.R. § 104.31.

128.    In general, "[a] recipient that operates a public elementary or secondary education program or activity shall provide a free appropriate public education to each qualified

handicapped person who is in the recipient's jurisdiction, regardless of the nature or severity of the person's handicap." 34 C.F.R. § 104.33(a).

129.    Defendants Sturgis and Sturgis Board are recipients of federal financial assistance and operate a public elementary or secondary education program or activity. Therefore, they are covered entities under 29 U.S.C. § 794.

130.    Defendants the ISD and the ISD Board are recipients of federal financial assistance and operate a public elementary or secondary education program or activity. Therefore, they are covered entities under 29 U.S.C. § 794.

131.    Defendant Michigan Department of Education is a recipient of federal financial assistance, operates a public elementary or secondary education program or activity, and/or receives federal financial assistance for the operation of elementary and secondary program or activities. Therefore, it is a covered entity under 29 U.S.C. § 794.

132.    Defendant Michigan State Board of Education is a recipient of federal financial assistance, operates a public elementary or secondary education program or activity, and/or receives federal financial assistance for the operation of elementary and secondary program or activities. Therefore, it is a covered entity under 29 U.S.C. § 794.

133.    Aaron is a person with a disability within the meaning of 29 U.S.C. § 794.

134.    Defendants have intentionally discriminated against Aaron in violation of Section 504 by acting in bad faith and with gross misjudgment in failing to provide a FAPE and concealing this failure from Aaron and his family.

135.    Defendants have intentionally discriminated against Aaron in bad faith and with gross misjudgment by failing to provide the auxiliary aids and services needed to ensure effective communication.

25

136.    Defendants have otherwise intentionally discriminated against Aaron in bad faith and/or with gross misjudgment in violation of Section 504.

137.    As a direct and proximate cause of Defendants' violation of Section 504, Aaron has suffered and continues to suffer severe and grievous mental and emotional suffering, humiliation, stigma, and other injuries he will continue to suffer.

138.    The Defendants, through their actions and failure to accommodate Aaron, have denied Aaron meaningful, equal access to classroom instruction and an opportunity for language learning equal to his peers.

### D.    DEFENDANTS VIOLATED TITLE II OF THE AMERICANS WITH DISABILITIES ACT, 42 U.S.C. §§ 12131 *et seq.*

139.    Plaintiff incorporates by reference all previous paragraphs of the Complaint herein.

140.    Title II of the ADA and its regulations provide that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. (*See also* 28 C.F.R. Part 35).

141.    Defendants are each a public entity subject to Title II of the ADA, 42 U.S.C. § 12131.

142.    Aaron is a person with a disability within the meaning of 42 U.S.C. § 12102.

143.    Defendants have intentionally discriminated against Aaron in violation of Title II by acting in bad faith and with gross misjudgment in failing to provide a FAPE and concealing this failure from Aaron and his family.

144.     Defendants have intentionally discriminated against Aaron in bad faith and with gross misjudgment by failing to provide the auxiliary aids and services needed to ensure effective communication.

145.     Defendants intentionally violated Aaron's rights under the ADA and the regulations promulgated here under by acting in bad faith and with gross misjudgment while excluding him from participation in and denying them the benefits of Defendants' services, programs, and activities, and by subjecting him to discrimination in violation of 42 U.S.C. § 12132.

146.     Defendants otherwise intentionally discriminated against Aaron in violation of 42 U.S.C. § 12132.

147.     As a direct and proximate cause of Defendants' violations of the ADA, Aaron has suffered and continues to suffer severe and grievous mental and emotional suffering, humiliation, stigma, and other injuries he will continue to suffer.

148.     The Defendants, through their actions and failure to accommodate Aaron, have denied Aaron meaningful, equal access to classroom instruction and an opportunity for language learning equal to his peers.

**E.     DEFENDANTS VIOLATED THE PERSONS WITH DISABILITIES CIVIL RIGHTS ACT, M.C.L. 37.1101 *et seq.***

149.     Plaintiff incorporates by reference all previous paragraphs of the Complaint herein.

150.     The Persons with Disabilities Civil Rights Act ("PDCRA") guarantees, as a civil right, the full and equal utilization of public accommodations, public services, and educational facilities without discrimination because of a disability. M.C.L. 37.1102.

151.    The PDCRA further prohibits educational institutions from "[d]iscriminat[ing] in any manner in the full utilization of or benefit from the institution, or the services provided and rendered by the institution to an individual because of a disability that is unrelated to the individual's ability to utilize and benefit from the institution or its services, or because of the use by an individual of adaptive devices or aids." M.C.L. 37.1402.

152.    Defendants are each an educational facility within the meaning of M.C.L. 37.1102 and an educational institution within the meaning of M.C.L. 37.1401.

153.    Aaron has a disability as defined in M.C.L.A. 37.1103.

154.    Aaron's disability is unrelated to his ability to utilize and benefit from Defendants' services.

155.    Defendants discriminated against Aaron in the full utilization of or benefit from the services provided and rendered by Defendants due to Aaron's disability.

156.    Defendants otherwise violated Aaron's rights under the PDCRA.

157.    The Defendants, through their actions and failure to accommodate Aaron, have denied Aaron meaningful, equal access to classroom instruction and an opportunity for language learning equal to his peers.

## VI. PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests the following relief:

A.    Find that Defendants violated state and federal law;

B.    Order compensatory education for Aaron;

C.    Order related services, such as social work services, for Aaron;

D.    Order compensatory family support services for Aaron;

E.    Find that Plaintiff is the prevailing party;

F.      Award Plaintiff compensatory damages;

G.      Award Plaintiff his reasonable attorney's fees and costs under 42 U.S.C. § 1988

and/or other applicable statues;

H.      Any other relief deemed necessary.

Respectfully submitted,


Dated: March 29, 2018                    By:_____s/ Mark Cody_____
                                         Mark Cody (P42695)
                                         Michigan Protection and Advocacy Service, Inc.
                                         Attorney for Plaintiff
                                         4095 Legacy Parkway, Suite 500
                                         Lansing, MI 48911
                                         (517) 487-1755
                                         mcody@mpas.org

                                         Caroline Jackson (*Admission pro hac vice pending*)
                                         Anna Bitencourt (*Admission pro hac vice pending*)
                                         National Association of the Deaf Law and
                                         Advocacy Center
                                         8630 Fenton Street, Suite 820
                                         Silver Spring, MD 20910
                                         (301) 587-7466
                                         caroline.jackson@nad.org

                                         *Attorneys for Plaintiff*